IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DEAVRIN SNEED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:23-cv-743-K |
| | § | |
| CROWN EQUIPMENT | § | |
| CORPORATION and TARGET | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Defendant Crown Equipment Corporation ("Crown") has filed Motions to Exclude the Proposed Expert Opinions of Jason Kerrigan and Robert Bullen. *See* Dkt. Nos. 79 & 80.

Plaintiff Deavrin Sneed filed a response to each motion, *see* Dkt. Nos. 83 & 85, and Crown filed respective replies, *see* Dkt. Nos. 92 & 93.

United States District Judge Ed Kinkeade has referred these motions to the undersigned United States Magistrate Judge for findings, conclusions, and recommendation under 28 U.S.C. § 636(b). *See* Dkt. No. 108.

For the reasons explained below, the Court grants Crown's motions [Dkt. Nos. 79 & 80]. *See Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 346 n.2 (5th Cir. 2020) (the admissibility of an expert report is "a non-dispositive matter," which can be "'referred to a magistrate judge to hear and decide'" under Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A)).

## Background

This is a products liability case arising from a workplace incident involving a Crown RC5500 Series stand-up rider forklift (the "subject forklift").

Crown's RC5500 stand-up, side-stance forklifts are used to move palleted materials in warehouse facilities. *See* Dkt. No. 78-1 at 13. When operating the forklift, the driver stands sideways with their hands on the controls while leaning against a backrest. *See id.* at 23. And they use their feet to operate the service brake and "power-on pedal." *See id.* at 24-25. The operator compartment is open (i.e., there is no door). *See id.* at 12.

Operators use the multi-function handle to control travel direction and speed. *See id.* at 27. And they can stop the forklift by braking or using a technique called "plugging," in which the operator pulls or pushes the multi-function handle in the opposite direction of the direction of travel to slow and stop the forklift. *See id.* at 25-27.

Plaintiff Sneed alleges that, as he was loading and unloading pallets with the subject forklift at a Target Distribution Center, it malfunctioned and accelerated at a high rate of speed; the brake mechanism failed; and he crashed into a pole, resulting in severe injuries, including a partial leg amputation. *See* Dkt. No. 28 at 2-3.

Sneed asserts claims against Crown under theories of (1) product liability – design defect; (2) product liability – manufacturing defect; (3) general negligence (including premises liability, failure to warn, improper supervision, and improper maintenance/inspection claims, among others); (4) negligent/faulty maintenance; and

(5) negligent/faulty repair work. *See id.* at 4-7. Sneed also seeks punitive damages for malice or gross negligence. *See id.* at 5.

Sneed retained and designated Jason Kerrigan, Ph.D., and Robert Bullen, P.E., J.D., as expert witnesses to testify regarding purported design defects concerning the subject forklift. *See* Dkt. No. 69. Dr. Kerrigan and Mr. Bullen both submitted expert reports. *See* Dkt. Nos. 79-1 at 11-32 & 80-1 at 24-53.

Sneed proffers Dr. Kerrigan to opine that the subject forklift was defective in design because of the forklift's open operator compartment and the lack of an operator backrest sensor. *See* Dkt. No. 79-1 at 11-32. Dr. Kerrigan suggests that the subject forklift should be equipped with an enclosure or door and a backrest sensor. *See id.*

And Sneed offers Mr. Bullen to opine that the subject forklift's design was defective and unreasonably dangerous because of the optical switch's design for the multifunction control handle and the control module programming's response to an event where there is an accelerator sensor error. *See* Dkt. No. 80-1 at 24-53. And, so, Mr. Bullen suggests that the subject forklift should be equipped with a "more robust" optical switch and that the control module should be reprogrammed to respond to a hypothetical accelerator sensor error by automatically braking. *See id.*

Crown moves to exclude both opinions. It contends that Dr. Kerrigan and Mr. Bullen are unqualified to render opinions regarding proposed design alternatives and that their opinions are unreliable.

### Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony as evidence. Rule 702 permits opinion testimony from a

> witness "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's knowledge will assist the trier of fact, and (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert has reliably applied the principles and methods to the facts of the case."

*VeroBlue Farms USA Inc. v. Wulf, No.* 3:19-CV-764-X, 2023 WL 348963, at *6 (N.D. Tex. Jan. 20, 2023) (quoting *Ramos v. Home Depot Inc.*, No. 3:20-cv-1768-X, 2022 WL 615023, at *1 (N.D. Tex. Mar. 1, 2022) (cleaned up)).

"In its gatekeeping role, the Court determines the admissibility of expert testimony based on Rule 702 and [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993),] and its progeny." *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 800 (N.D. Tex. 2018), *aff'd*, No. 3:11-cv-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018). Under Rule 702 and *Daubert*,

> [a]s a gatekeeper, this Court must permit only reliable and relevant testimony from qualified witnesses to be admitted as expert testimony. The party offering the expert testimony has the burden of proof, by a preponderance of evidence, to show that the testimony is reliable and relevant.

*Ramos*, 2022 WL 615023, at *1 (cleaned up). And "*Daubert*'s general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Applying this analytical framework under Rule 702 and *Daubert*, a "court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit,

and (3) the evidence is reliable." *Galvez v. KLLM Transp. Servs., LLC*, 575 F. Supp. 3d 748, 759 (N.D. Tex. 2021).

"First, an expert must be qualified. Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training or education." *Aircraft Holding Sols., LLC v. Learjet, Inc.*, No. 3:18-cv-823-D, 2022 WL 3019795, at *5 (N.D. Tex. July 29, 2022) (cleaned up). "The distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Holcombe v. United States*, 516 F. Supp. 3d 660, 679-80 (W.D. Tex. Feb. 2, 2021) (cleaned up); *accord Arnold v. Allied Van Lines, Inc.*, No. SA-21-CV-00438-XR, 2022 WL 2392875, at *18 (W.D. Tex. July 1, 2022) ("Testimony regarding first-hand, historical perceptions constitutes lay, not expert, opinion testimony."). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Aircraft Holding*, 2022 WL 3019795, at *5 (cleaned up).

And, if the expert is qualified, "Rule 702 charges trial courts to act as gate-keepers, making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Expert testimony must be both relevant and reliable to be admissible." *Hall v. State*, No. CV H-21-1769, 2022 WL 2990912, at *4 (S.D. Tex. July 28, 2022) (cleaned up).

> Expert testimony is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue. Federal Rule of Evidence 401 further clarifies that relevant evidence is evidence that has "any tendency to make a fact more or less probable than it would be without evidence" and "is of consequence in determining the action."

*Id.* (cleaned up). "Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). "To be relevant, the expert's reasoning or methodology [must] be properly applied to the facts in issue." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022) (cleaned up).

"When performing [the required gate-keeping Rule 702 and *Daubert*] analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). "Assisting the trier of fact means the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument," but "the helpfulness threshold is low: it is principally ... a matter of relevance." *Id.* at 293-94 (cleaned up).

As to reliability, the required "analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia," and "mandates that expert opinion be grounded in the methods and procedures of science." *Jacked Up*, 291 F. Supp. 3d at 801 (cleaned up). "Expert evidence that is not reliable at each and every step is not admissible." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "Expert testimony is reliable if the reasoning or methodology underlying the testimony is scientifically valid." *Ramos*, 2022 WL 615023, at *1 (cleaned up).

"Such testimony must be more than subjective belief or unsupported speculation." *Id.* (cleaned up). "In other words, this Court need not admit testimony that is connected to existing data only by the *ipse dixit* [– that is, an unproven and unsupported assertion resting only on the authority –] of the expert." *Id.* (cleaned up). "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Holcombe*, 516 F. Supp. 3d at 687 (cleaned up).

"Experts are permitted to rely on assumptions when reaching their opinions," but "those assumptions must have some factual basis in the record and an underlying rationale." *Jacked Up*, 291 F. Supp. 3d at 806-07 (cleaned up). "But there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Id.* at 801 (cleaned up). More specifically, "[e]xperts are permitted to assume the fact of liability and opine about the extent of damages," and "[a]n expert's reliance on assumptions does not itself make the expert opinion unreliable or inadmissible." *ENGlobal U.S. Inc. v. Native Am. Servs. Corp.*, No. CV H-16-2746, 2018 WL 1877015, at *8 (S.D. Tex. Apr. 19, 2018) (cleaned up).

And Federal Rule of Evidence 703 "permit[s] an expert witness to base his opinion on 'facts or data ... that the expert has been made aware of or personally observed' and to opine [and base his opinion] on inadmissible evidence if 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.' " *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 269 & n.10 (cleaned up). More specifically, courts have concluded that, although a party's damages expert "did not personally observe the facts or data in [another expert's

report], as a damages expert, he may rely on hearsay, including other expert reports, in forming his opinions." *ENGlobal*, 2018 WL 1877015, at *11 (cleaned up).

Still, "Rule 702 and *Daubert* require an expert witness independently to validate or assess the basis for his or her assumptions," and "[t]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable," which "requires some objective, independent validation of the expert's methodology." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. In the words of the Third Circuit, the suggestion that the reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results from an unduly myopic interpretation of Rule 702 and ignores the mandate of *Daubert* that the district court must act as a gatekeeper." *Jacked Up*, 807 F. App'x at 348 (cleaned up). "In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* at 348-49 (cleaned up). "The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 268 (cleaned up).

"The Court normally analyzes questions of reliability using the five nonexclusive factors known as the *Daubert* factors, [which are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community]." *Ramos*, 2022 WL 615023, at *1 & n.11 (cleaned up). "But these factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kim v. Nationwide Mut. Ins. Co.*, No. 3:21-cv-345-D, 2022 WL 2670393, at *5 (N.D. Tex. July 11, 2022) (cleaned up). "The point of this inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Holcombe*, 516 F. Supp. 3d at 674 (cleaned up).

"The Court also does not need to admit testimony based on indisputably wrong facts." *Ramos*, 2022 WL 615023, at *1 (cleaned up). "The Fifth Circuit has recognized that [t]he *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion,' " and "an opinion based on insufficient, erroneous information, fails the reliability standard." *Jacked Up*, 291 F. Supp. 3d at 802 (cleaned up). "And although the *Daubert* reliability analysis is flexible and the

proponent of the expert evidence need not satisfy every one of its factors, the existence of sufficient facts ... is in all instances mandatory." *Id.* (cleaned up).

But, "[i]n conducting its analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology." *Ramos*, 2022 WL 615023, at *1 (cleaned up). A motion to exclude is not properly based on an "objection that goes to whether [the proffered expert's] opinion is correct, not whether it is reliable," where "[t]he proponent need not prove to the judge that the expert's testimony is correct, but," rather, "by a preponderance of the evidence that the testimony is reliable." *Aircraft Holding*, 2022 WL 3019795, at *8 (cleaned up). "Even when a court rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019), as revised (Aug. 9, 2019) (cleaned up). And, so, "[w]hen the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *ENGlobal*, 2018 WL 1877015, at *8 (cleaned up).

The Court cannot accept arguments that "urge[ ] the Court to establish an unattainable goalpost, essentially arguing that each item of expert testimony is unreliable insofar as it fails to conclusively prove [the expert testimony's proponent's] theory of its case or an element of a claim or defense," and thereby "confus[e] admissibility with sufficiency, and sufficiency with certainty." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). That "is not the standard for admissibility," or "even

the standard for success on the merits," and "[i]t is not the Court's role, in the context of a *Daubert* motion, to judge the conclusions that an expert's analysis generates; the ultimate arbiter of disputes between conflicting opinions is the trier of fact." *Id.*

"If, however, there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered, the court may exclude the testimony as unreliable." *Kim*, 2022 WL 2670393, at *5 (cleaned up). For example, "the Court may exclude [an expert witness's] analysis if the studies that he relies on are so dissimilar to the facts presented that [the expert witness's] opinions cannot be sufficiently supported by the studies." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up). "But the notion that expert testimony is only admissible to the extent that it is based on studies of identical individuals under identical circumstances would not only turn the 'flexible' inquiry envisioned under Rule 702 on its head, but such rigid constructions of reliability and relevance would defeat the very purpose of expert testimony: to help the trier of fact understand and evaluate the evidence." *Id.* at 676-77 (cleaned up).

The "evidentiary gates [provided by Rule 702 and *Daubert*] exist to keep out error that may impermissibly affect the jury" and "to protect juries from unreliable and irrelevant expert testimony." *Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th at 264, 268. But "[t]he court's inquiry is flexible in that [t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *Aircraft Holding*, 2022 WL 3019795, at *6 (cleaned up). And, "[p]articularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role – the court's role is limited to

ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. Thus, [w]hile the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, the rejection of expert testimony is the exception rather than the rule." *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022) (cleaned up).

And "[t]he Fifth Circuit has noted that [a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration," and, "[a]ccordingly, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Ramos*, 2022 WL 615023, at *3 (cleaned up). Generally, an opposing party's "doubts about the bases for [an expert's] opinions do not render his opinions so unsupported as to create 'too great an analytical gap' between the evidence he relies on and his opinions." *Holcombe*, 516 F. Supp. 3d at 675 (cleaned up).

### Analysis

To prevail on his design defect claim, Sneed must show that "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322 (5th Cir. 2014) (citing *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a).

A safer alternative design means:

a product design other than the one actually used that in reasonable probability: (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(b).

## I.     **Expert Jason Kerrigan, Ph.D.**

In support of his design defect claim, Sneed offers Dr. Kerrigan's opinion to show that a safer alternative design existed. Specifically, Dr. Kerrigan proffers that,

[i]n the Crown forklift at issue, an operator's use of the backrest is part of the operator's operating position. Yet, the small "hip return" curvature of back rest provides only minimal restraint to the occupant, and the backrest does not have a sensor that could function like the brake pedal to ensure that the occupant is in a proper position (both feet on floor, both hands on controls, and back pushing on the backrest) for forklift operation. Such a backrest sensor could also have been easily included in the design as another safety precaution to lockout machine function and apply braking without sufficient pressure or contact on the backrest.
…

[And] [a] physical door eliminates the chance that a forklift operator could place any of their limbs outside the running lines of the forklift and in harm's way. If there was a physical barrier, door or otherwise, covering that occupant compartment opening, Mr. Sneed would not have been able to put his left foot out and his injury would not have occurred.

Dkt. No. 79-1 at 17-20; *see also* Dkt. No. 85 at 15-16.

### A.  Dr. Kerrigan is Qualified

Crown contends that Dr. Kerrigan is not qualified by education, training, or experience to render opinions regarding the subject forklift's design. *See* Dkt. No. 79

at 6-10.

Crown acknowledges that Dr. Kerrigan has a PhD in and is a Professor of Mechanical and Aerospace Engineering. *See id.* at 6. And Dr. Kerrigan's work has focused on injury biomechanics, including research studies for automobile manufacturers (such as Toyota, Honda, and Hyundai) concerning occupant protection in rollover crashes and other studies related to the impact of crash events on the human body. *See id.* at 6.

But Crown asserts that Dr. Kerrigan has "little to no experience in the actual field of design or in the field of forklifts in general." *Id.* at 7.

It contends that Dr. Kerrigan admitted at his deposition that he "has never worked for a company that designs, builds, or manufactures stand-up rider forklifts," "has never designed any component part of a stand-up rider forklift," "has never published any articles that deal with forklift operation, safety, or design issues," and "has never been responsible for making design decisions regarding the design of a stand-up rider forklift." *Id.* at 9.

In response, Sneed asserts that Dr. Kerrigan is an expert in injury biomechanics, which is an engineering field that relies upon physics "to study the situations surrounding human injury." Dkt. No. 85 at 19 (emphasis omitted). Sneed states that "Dr. Kerrigan has vast experience in engineering and his extensive experience designing and testing Crown forklifts are all evidence that his education and experience qualify him to testify about inherent defect design of the [f]orklift." *Id.* at 19-21.

And, in support, Sneed offers a declaration from Dr. Kerrigan stating that,

[w]ith regard to design, I have extensive experience in mechanical design: this is a fundamental part of the field of Mechanical Engineering, which is the field from which I hold a PhD, and the field in which I am currently employed to train undergraduate and graduate students at the University of Virginia. The defense is claiming that since I have not been employed by a forklift designer, or because I have not formally completed any designs of forklifts or forklift parts, I am not qualified to offer opinions about those designs. I regularly develop designs related to my research, and provide design opinions regularly to the automobile industry (OEMs, and tier-one suppliers) as part of my research.
…
[and] [w]ith regard to "experience in the actual …field of forklifts", I have extensive experience. I began studying forklift designs in April of 2016 when I was retained in my first case involving a left lower extremity injury to the operator of a stand-up forklift (Petersen v. Raymond). Since then, and over the last 8+ years, I have reviewed and studied deposition testimony, defense and plaintiff's expert reports, and other materials produced during discovery in a total of 13 different civil litigation matters involving left lower extremity injuries sustained by operators of stand-up forklifts similar to the subject forklift in this matter (see my Rule 26 report, pages 23-24). I have spent literally hundreds of hours reviewing materials from these cases, information about forklift design, forklift design standards, and the scientific literature pertaining to issues similar to the issues of the current case. My experience in field of forklifts is extensive.

*Id.* at 4.

The Fifth Circuit has stated that "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). And "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* (cleaned up).

Considering Dr. Kerrigan's background and experience in engineering and mechanical design, and specifically his work concerning occupant protection and the

impact of crash events in the automobile industry, he is qualified to opine regarding the subject forklift's design.

And, so, the Court finds that Dr. Kerrigan is qualified.

B. Dr. Kerrigan's Opinions are Unreliable

As explained above, the Court should not, in its gatekeeping role under Rule 702 and *Daubert*, exclude a proffered expert witness's opinion or testimony because (1) it is not correct; (2) it contradicts other expert testimony or relies on a sets of facts that conflicts with that relied on by contradictory expert testimony, even if that contradictory expert testimony has been found to be reliable; or (3) it does not conclusively prove the proponent's theory of its case or an element of a claim or defense.

But the party offering the expert testimony bears the burden of proof, by a preponderance of evidence, to show that a qualified expert's testimony is relevant (that is, the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, and the expert's reasoning or methodology properly can be applied to the facts in issue) and reliable (that is, the testimony is based on sufficient facts or data and is the product of reliable principles and methods).

The Court should exclude expert testimony where (1) the expert cannot bring to the jury, on a matter of relevance, more than the lawyers can offer in argument; (2) the expert testimony is based only on subjective belief or unsupported speculation or is connected to existing data only by the unproven assertion of the expert, resting

solely on the expert's authority; (3) there is simply too great an analytical gap between the basis for the expert opinion and the opinion proffered (such as if the studies that the expert relies on are so dissimilar to the facts presented that the expert's opinions cannot be sufficiently supported by the studies); (4) the expert testimony is based on indisputably wrong or erroneous or insufficient facts; (5) the proponent fails to provide some objective, independent validation of the expert's methodology; (6) the source on which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion; or (7) the expert relies on assumptions that have no factual basis in the record or no underlying rationale.

Crown contends that Dr. Kerrigan's opinions regarding the subject forklift's design and specifically, the purportedly safer alternative designs that he proffers, should be excluded because they are unreliable.

As discussed above, Dr. Kerrigan proposes the addition of a physical enclosure or door to the operator compartment of the forklift and the inclusion of a backrest sensor. *See* Dkt. No. 79-1 at 11-32.

Crown asserts that it is "[f]atal to Dr. Kerrrigan's proposed alternative design 'concepts' [that] he has provided nothing beyond speculation as to what type of operator compartment door or backrest sensor should be implemented on the Crown RC5500 [and] how they would be manufactured and implemented on the RC5500." Dkt. No. 79 at 12. And he "has not and cannot provide any design details or show any reliable methodology regarding its untested and unengineered 'concepts.'" *Id.* at 13.

As to the backrest sensor, Crown states that

> Dr. Kerrigan admitted that he has not developed any design drawings regarding where he would place a backrest sensor or what type of backrest sensor he would add to the Crown RC5500. Specifically, he testified that "I didn't try to come up with a specific design of anything [regarding the backrest sensor]." He has not developed any prototypes, mockups, nor performed any testing whatsoever regarding his backrest sensor "concept". In proffering his backrest sensor "concept", Dr. Kerrigan did not apply a reliable—or indeed any—methodology as required by Daubert. Accordingly, his backrest sensor alternative design opinions must be excluded.

*Id.* (cleaned up).

And as to the operator compartment door, Crown asserts that

> Dr. Kerrigan also admitted that he has "not created any drawings of any designs [regarding compartment doors]." He further testified that he has not conducted any testing on a forklift equipped with a door. Specifically, he testified that "I haven't done any testing of any doors at all in this scenario here." Dr. Kerrigan further admitted that:
> - He has not determined the weight of the door he would add to the Crown RC5500;
> - He has not determined whether the door would be spring-loaded or latched; and
> - He has not determined the tension of the spring that would be required to keep the door shut.

*Id.* (cleaned up).

Crown also points out that Dr. Kerrigan admitted that he has "performed no testing" for this case. Dkt. No. 93 at 6; Dkt. No. 86 at 5. And Dr. Kerrigan stated that he has "not formed a specific opinion about all the factors that would need to be considered to implement design changes." Dkt. No. 86 at 3.

Crown further contends that Dr. Kerrigan has not reliably established that an operator compartment door or a backrest sensor are safer alternative designs that would have prevented or significantly reduced the risk of Sneed's injury under the specific circumstances of this accident. *See* Dkt. No. 79 at 14-16.

In support of its contention, Crown states that

> Dr. Kerrigan admitted that he has no sketches, calculations, or measurements of the accident scene or the subject forklift and, in fact, has never even been to the accident scene. Further, he did not conduct a reconstruction of Plaintiff's accident, nor did he even attempt to calculate the accelerations or speed of the forklift prior to the accident. He also concedes that he is not even sure when Plaintiff began to "plug" (use the multifunction control handle to reduce speed) or use the service brake because he "cannot see in the video when [Plaintiff] took his foot off of the foot pedal brake." He also recognizes that operators can open a door at any time during operation, which could lead to this same injury.
>
> Further, Dr. Kerrigan admitted that his backrest sensor "concept" would not have prevented Plaintiff's injuries in this accident: "if the backrest sensor was there, I still think that some way that prevents the occupant from placing their extremities outside the running lines of the forklift while it's moving would be required." And regarding his operator compartment door "concept", when asked whether, if a manufacturer added a door to a stand-up rider forklift, lower left leg injuries would still occur, he testified, "[s]ure. Anything could happen."

Dkt. No. 93 at 7 (cleaned up).

In response, Sneed states that Dr. Kerrigan employed "a methodology that is usually and customarily followed by biomechanical experts and engineers who are called upon to investigate and solve questions of this nature." Dkt. No. 83 at 16.

Sneed further contends that Dr. Kerrigan's testimony "is applied by reliable standards and principles" and that his report is based on information from "a reliable source, i.e. Plaintiff's live and deposition testimony, the surveillance video of the [i]ncident or reliable document[s]." Dkt. No. 82 at 12.

Dr. Kerrigan adds that he "formed [his] opinions through analysis of material produced in discovery, [his] review of the relevant scientific literature, and Crown's accident data." Dkt. No. 86 at 5.

"Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Casey*, 770 F.3d at 332. And this testing "can be as simple as applying math and physics to establish the viability of a design." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 407 (5th Cir. 2016).

As noted above, Dr. Kerrigan admitted that has "performed no testing" for this case. Dkt. No. 86 at 5. And he stated that he has "not formed a specific opinion about all the factors that would need to be considered to implement design changes." *Id.* at 3.

Dr. Kerrigan's advocacy for the addition of a physical door or enclosure to the operator compartment and a backrest sensor as feasible design alternatives are without support from appropriate engineering work, product development, or testing.

And, so, Dr. Kerrigan's proposed alternatives amount to speculative concepts, which is insufficient to rise to the level of an admissible expert opinion. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997) ("[T]he proper methodology for proposing alternative designs includes more than just conceptualizing possibilities"); *accord Guy v. Crown Equip. Corp.*, 394 F.3d 320 (5th Cir. 2004) (affirming district court's exclusion of plaintiff's expert under *Daubert* because he relied on unscientific conceptual sketches and broad ideas and failed to test of any their designs).

And Dr. Kerrigan did not show that his proposed alternatives would have changed the outcome of this accident. As Crown points out, Dr. Kerrigan admitted that the backrest sensor would likely be insufficient without "some way that prevents

the occupant from placing their extremities outside the running lines of the forklift while it's moving." And it would not change this accident because Sneed testified that "part of his back was against the backrest immediately before the accident." Dkt. No. 79-1 at 100.

Concerning the operator door alternative, Dr. Kerrigan testified that the addition of a door would not necessarily prevent lower left leg injuries. *See id.* at 96-97. And, while Dr. Kerrigan may have reviewed Crown's accident data, it is "not evidence of the alternative design's superior safety because it did not involve similar forces and factors" as involved in Sneed's accident. *Casey*, 770 F.3d at 332.

Dr. Kerrigan has not met his obligation under *Daubert* to identify data supporting his opinions that an operator compartment door or a backrest sensor were feasible or that either would have changed the outcome of the incident at issue.

And, because Dr. Kerrigan has not connected his opinions to existing data, the Court agrees that Dr. Kerrigan's proposed design alternatives are untested, based on unsupported speculation, and amount to *ipse dixit. See Kumho Tire*, 526 U.S. at 158 (nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert; cleaned up).

The Court finds that Dr. Kerrigan's opinions are unreliable and fail the *Daubert* analysis.

And, so, Dr. Kerrigan's opinions regarding the subject forklift's purported design defects and availability of a safer alternative design should be excluded.

II.    **Expert Robert Bullen, P.E., J.D.**

In support of his design defect claim, Sneed offers Mr. Bullen's opinion to show that the forklift was unreasonably dangerous and that a safer alternative design existed. Specifically, Mr. Bullen proffers that

> [i]t is my opinion that it was foreseeable, that dust and debris would be present in the areas where lift trucks such as the Crown model number RC5535-35, serial number 1A559567 lift truck would be operated, and that reasonable steps should be taken to utilize components (such as the optical switches) which are not susceptible to malfunction as a result of exposure to such dust and debris. This is exacerbated by the fact that the machine controls fail to bring the unit to a controlled stop upon detecting an error with these components, but rather cause the unit to coast freely. A mere substitution of switches and programming change could prevent such risks to operators. These modifications were viable, technologically and economically feasible at the time the subject RC style truck was produced.

Dkt. No. 80-1 at 52.

A.    Mr. Bullen is Qualified

Crown contends that Mr. Bullen is not qualified by education or experience to render opinions regarding the subject forklift's design. *See* Dkt. No. 80 at 7-10.

Crown acknowledges that Mr. Bullen is a licensed Professional Engineer with more than 25 years of experience in both the biomedical and mechanical engineering fields. *See id.* at 8. And, according to Mr. Bullen's curriculum vitae, Mr. Bullen's experience has primarily concerned "biomedical engineering (both research and primary care) and consulting engineering for the design and construction of industrial manufacturing plants and code compliance issues." *Id.*

But Crown asserts that Mr. Bullen's work has never "involved the consideration of how a forklift should be designed or how the electrical component

within a forklift should be designed." *Id.* And it contends that Mr. Bullen admitted at his deposition that he "is not an electrical engineer and does not hold himself out" as one. *Id.*

And, so, Crown's position is that Mr. Bullen lacks the requisite expertise in the field of electrical engineering and forklift design. *See id.* at 10.

In response, Sneed asserts that Mr. Bullen has "acquired extensive equipment/machinery operational and training experience, including forklifts, aerial lifts, construction and agricultural equipment" throughout his career. Dkt. No. 82 at 3. And "[d]ating back to the 1990's' Mr. Bullen has dedicated a significant amount of time and study into Crown forklifts safety, safety design, and safety compliance." Dkt. No. 85 at 3. He is also a certified forklift operator/trainer. *See* Dkt No. 80-1 at 56.

As noted above, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Huss*, 571 F.3d at 452. And "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* (cleaned up).

Considering Mr. Bullen's background and experience in engineering and work involving forklifts, he is qualified to provide expert opinions regarding the subject forklift's design.

And, so, the Court finds that Mr. Bullen is qualified.

B.  <u>Mr. Bullen's Opinions are Unreliable</u>

Crown contends that Mr. Bullen's opinions regarding the subject forklift's design and, specifically, the purportedly safer alternative designs that he proffers

should be excluded because they are unreliable.

As discussed above, Mr. Bullen's proposes incorporating a "more robust" optical switch and reprogramming the control module to respond to a hypothetical accelerator sensor error by automatically braking. *See* Dkt. No. 80-1 at 24-53.

Crown asserts that it is "[f]atal to Mr. Bullen's proposed alternative design 'concepts' [that] he has provided nothing beyond speculation regarding whether the electrical optical switch he proposed is actually a safer design." Dkt. No. 80 at 13. And "his opinion that Crown should modify the programming of the control module such that, in the event of an erroneous signal from the optical switches, the machine could be made to automatically brake, is entirely speculative because he has never installed this type of program or coding sequence in a forklift before, and never tested the 'concept.'" *Id.*

As to the "more robust" optical switch, Crown states that

Mr. Bullen admitted that he has never installed his proposed "more robust" optical switch on any forklift and tested the feasibility or application of his "concept". In fact, he testified that he "would not recommend going through trying to redesign an entire feature around a different switch". Most importantly, he testified that he does not even know what exactly caused the optical switch to allegedly malfunction in this accident. Mr. Bullen has not and cannot identify what the alleged "foreign body" was that allegedly caused the optical switch to malfunction. His use of the magic words "more likely than not" does not cure the purely speculative nature of that opinion. In proffering his "more robust" optical switch "concept", Mr. Bullen does not apply reliable methodology as required by *Daubert* and, thus his conceptual alternative design opinion must be excluded.

*Id.* at 13-14 (cleaned up).

And as to reprogramming the control module, Crown asserts that

Mr. Bullen testified that he has not personally developed any program or revised coding to implement his proposed "concept". He admitted that he has never implemented his proposed control module reprogramming on any stand-up rider forklift. His testimony that he has never reprogrammed any control module on a forklift, let alone a Crown RC5500, or tested any reprogrammed control module, is fatal to his proposed "concept". Ultimately, Mr. Bullen's optical switch and control module reprogramming "concepts" are completely speculative because he has provided no evidence that his alternative "concepts" would be safer.

*Id.* at 14 (cleaned up).

Crown further contends that Mr. Bullen has not reliably established that a "more robust" optical switch or control module reprogramming would have prevented or significantly reduced the risk of Sneed's injury under the specific circumstances of this accident. *See id.* at 14-17.

Regarding Mr. Bullen's investigation of the subject accident, Crown states that

Mr. Bullen admitted that he did not perform an accident reconstruction. He testified that he did not prepare any accident site survey. He further testifies that "[t]he video didn't have sufficient clarity for [him] to be able to look at specific movement. Ultimately, Mr. Bullen stated that he "didn't feel that [the video] had enough clarity to specify any particular motion…". Mr. Bullen testified that he does not intend to offer any opinions regarding the specific accelerations that Plaintiff experienced during the accident sequence. He also has no opinion assessing how Plaintiff's foot exited the operator compartment. Mr. Bullen also has no opinion regarding whether the brakes failed at the time of Plaintiff's accident. Mr. Bullen testified that he has no opinion when Plaintiff began to "plug" or when Plaintiff first applied the service brake. He has no opinion regarding the speeds that the Crown RC5500 was traveling during the accident sequence.

*Id.* at 15 (cleaned up).

And, in support of its contention that Mr. Bullen cannot opine that his proposed design alternatives would have prevented Sneed's injuries, Crown contends that

> Mr. Bullen testified that he has not done a full analysis of whether or not the optical switch was receiving an electrical signal at the time of the accident. In trying to replicate what he believes caused the accident, Mr. Bullen performed ten tests at a post-accident inspection of the subject Crown RC5500 to determine if the signal in the optical switch was occluded or interfered with, and all ten tests showed that the optical switch signal worked properly as expected. When asked if the type of accident Plaintiff experienced could still occur with his proposed optical switch "concept", Mr. Bullen admitted that there is "absolutely" the potential for dust or debris buildup which could interfere with the electrical signal even if his proposed "more robust" optical switch "concept" was implemented into the subject RC5500. He admits that even his "more robust" optical switch would not have prevented this accident as required under Texas law. Moreover, Mr. Bullen testified that he does not know what exactly caused the optical switch to allegedly malfunction. Because Mr. Bullen cannot even identify the foreign body, he has not attempted to replicate that alleged foreign body to test whether it would have made any difference in this accident sequence. Mr. Bullen's "more robust" optical switch "concept" is completely speculative and he categorically cannot opine that this "concept" would have prevented Plaintiff's injuries here.
>     Next, regarding his control module reprogramming "concept", Mr. Bullen opines that the control module should be reprogrammed so that when an accelerator sensor error is displayed on the RC5500, the full brakes should be immediately engaged. But, as stated above, he has not personally developed any program or revised coding or implemented his proposed control module reprogramming on any stand-up rider forklift.
> …
> Because he has conducted no analysis of the accident sequence, Mr. Bullen cannot articulate how the accident occurred, let alone how reprogramming the control module to immediately apply full braking in response to an alleged accelerator sensor error would have prevented this accident.

*Id.* at 15-17 (cleaned up).

In response, Sneed asserts that Mr. Bullen employed the same methodology

that he uses to analyze engineering issues. *See* Dkt. No. 85 at 13. Specifically, Mr. Bullen "follow[ed] a procedure that is of the kind that is usually and customarily followed by engineers who are called upon to investigate and answer questions related to the circumstances involved. [And] [t]he analytical procedures are the same as [he] ha[s] used in industry when evaluating product/use and/or situations involving products." *Id.*

Sneed contends that Mr. Bullen "has appropriate[ly] applied the facts of this specific case to come to his conclusion. *Id.* at 24. And Sneed states that his testimony "is applied by reliable standards and principles" and that his report is based on information from "a reliable source, i.e. Plaintiff's live and deposition testimony, the surveillance video of the [i]ncident or reliable document[s]." Dkt. No. 82 at 12.

Mr. Bullen's opinions are unreliable for reasons similar to the reasons that the Court determined that Mr. Kerrigan's are unreliable.

As noted above, Mr. Bullen admitted that he did not install his "more robust" optical switch on an actual forklift to test its feasibility or application. Dkt No. 80-1 at 77. And he did not implement his proposed control module reprogramming in a stand-up rider forklift. *See id.* at 81.

And, so, without support (such as product development or testing) that the "more robust" optical switch or control module reprogramming would have been feasible with respect to the Crown RC5500 forklift, Mr. Bullen's proposals cannot be classified as safer alternative designs but are rather speculative concepts.

Mr. Bullen also did not show that his proposed alternatives would have

changed the outcome of this accident.

As Crown pointed out, he admitted that there is "absolutely" the potential for dust or debris buildup that could interfere with the electrical signal even if the "more robust" optical switch was implemented. *See id.* at 78. And, because Mr. Bullen's analysis of the sequence of events leading up to the accident is, at best, incomplete, and he cannot identify with certainty how the accident occurred, he is unable to show that reprogramming the control module to automatically brake in the event of an accelerator sensor error would have prevented it.

Mr. Bullen's proposed design alternatives are untested and based on unsupported speculation. *Accord Guy*, 394 F.3d at 326. And he has not met his obligation under *Daubert* to identify data supporting his opinions that a "more robust" optical switch or reprogramming the control module would have changed the outcome of this accident.

The Court finds that Mr. Bullen's opinions are unreliable and fail the *Daubert* analysis.

And, so, Bullen's opinions regarding the subject forklift's purported design defects and availability of a safer alternative design should be excluded.

## Conclusion

For the reasons explained above, the Court grants Defendant Crown's Motions to Exclude the Proposed Expert Opinions of Jason Kerrigan and Robert Bullen. [Dkt. Nos. 79 & 80].

SO ORDERED.

DATED: February 10, 2025

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE